J-S31016-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1499 EDA 2022 |

Appeal from the Order Entered June 2, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000471-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1500 EDA 2022 |

Appeal from the Decree Entered June 3, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000213-2022

BEFORE:   BOWES, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED NOVEMBER 8, 2022**

Appellant R.M. (Father)[1] appeals from the decree and order granting the

petitions filed by the Philadelphia County Department of Human Services

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Child's birth certificate states that her father is unknown. **See** N.T. Hr'g, 6/2/22, at 85. Father is Child's putative father, and no other individuals have come forward claiming to be Child's father. **Id.**

(DHS) involuntarily terminating Father's parental rights to his minor daughter, A.M.G. (Child), and changing Child's permanency goal to adoption.[2] We affirm.

Briefly, on April 14, 2020, DHS obtained an order of protective custody (OPC) for Child after receiving a CPS (Child Protective Service) report that alleged that Child had unexplained injuries and Mother provided inconsistent explanations for those injuries. *See* OPC, 4/14/20, at 1-2. Child and her sibling, A.T., were moved to the home of A.T.'s paternal grandmother (Foster Mother) with a safety plan.[3] *See id.* DHS investigated the report and determined that the report was valid. N.T. Hr'g, 6/2/22, at 45.

DHS filed a dependency petition on April 20, 2020. At that time, Father's whereabouts were unknown. *See* Dependency Pet., 4/20/20, at 6 (unpaginated). On July 13, 2020, the trial court conducted a hearing and adjudicated Child dependent. *See* Order of Adjudication, 7/13/20, at 1. Father attended the adjudicatory hearing by video conference. *Id.*

The trial court held periodic permanency review hearings throughout the pendency of this case. At the first hearing, Father was found to be in minimal compliance. At each subsequent hearing, Father was found to be in no compliance.

---

[2] That same day, the trial court terminated the parental rights of S.A. (Mother). Mother did not file a separate appeal and is not a party to the instant appeal.

[3] Mother gave birth to a third child, D.A., in April 2020. *See* OPC, 4/14/20, at 1-2.

On March 31, 2022, DHS filed a goal change petition and a petition seeking the involuntary termination of Father's parental rights. The trial court held a combined termination and goal change hearing on June 2, 2022.[4] DHS presented the testimony of Community Umbrella Agency (CUA) caseworker Todd Marquess. Father testified on his own behalf.

Mr. Marquess testified that DHS received a CPS report in April 2020, and that CUA has provided services to the family since that time. N.T. Hr'g, 6/2/22, at 45. CUA established single case plan (SCP) objectives for Father at the outset of the case. *See id.* at 46. Mr. Marquess had minimal contact with Father throughout the pendency of the case. After CUA opened services for the family, it took Father about a year to connect with caseworkers. *Id.* at 47. At that time, Mr. Marquess advised Father regarding his SCP objectives, which included maintaining contact with CUA, visiting with Child, and allowing CUA to assess whether he had DNA testing or mental health needs. *Id.* at 47-48. Father denied any drug, alcohol, or mental health issues verbally to caseworkers, but never submitted to any assessments or evaluations. *Id.* at 51-52.

Father texted Mr. Marquess pictures of paystubs in March 2022 but had not recently provided proof of employment. *Id.* at 49. At the time of the

---

[4] John Capaldi, Esquire, served as Child's guardian *ad litem* throughout the proceedings. Attorney Capaldi argued that terminating Father's parental rights was in Child's best interests. N.T. Hr'g, 6/2/22, at 119-20. Andre Martino, Esquire, served as Child's legal counsel during the termination proceedings, and appeared at the hearing on her behalf. *Id.*; *see also In re Adoption of K.M.G.*, 240 A.3d 1218 (Pa. 2020).

hearing, Father lived with his mother in a structurally appropriate home. *Id.* at 50. However, Father was unsure whether he could use that address as a reunification home. *Id.* at 52-53.

Regarding his objective to maintain contact with CUA caseworkers, Father did not reach out to caseworkers or to Foster Mother to inquire about Child's well-being. *Id.* at 50. Foster Mother offered Father times for visits or birthday parties, but Father did not attend. *Id.* at 50-51. Father visited Child "once or twice" at Foster Mother's home, but Mr. Marquess was unsure of the dates of the visits. *Id.* at 51. Regardless, Father's visits were supposed to be supervised at the agency. *Id.* at 81. Child has not asked to visit with Father. *Id.*

Mr. Marquess stated, "[Father] hasn't really showed motivation that he wants to be a reunification resource. We aren't sure of his mental health or if he's had . . . DNA concerns." *Id.* at 46. Mr. Marquess rated Father's compliance with SCP objectives as "none." *Id.* at 55. Father's progress in alleviating the concerns leading to Child's placement were none. *Id.*

Mr. Marquess noted that Child was "tough" and "[had] a lot of issues."[5] *Id.* at 56. Child and Father do not share a parent-child bond due to Father's

---

[5] Although exact details are not contained within the record, it appears that at some point prior to the pendency of this case, it was alleged that Mother attempted to kidnap Child on October 31, 2020. *Id.* at 64-66. The charges were subsequently discharged. *Id.* at 65. Additionally, Child initially came into foster care due to allegations that Mother had neglected and physically abused her, and Child suffered trauma as a result of that abuse. *Id.* Father was never accused of abusing Child at any time during the pendency of the case.

minimal contact with her over the years. *Id.* at 56-57. Father never sent financial support, birthday cards, nor gifts for Child while she was in foster care. *Id.* at 57. Father never inquired about the therapeutic services Child received although he was aware of behavioral concerns, nor does it appear from the record, that he understood the seriousness of these concerns. *Id.* Further, Father never asked for input into Child's services nor did he seek to participate in her therapy or care. *Id.* at 58.

On this record it appears that Child is bonded with her Foster Mother and calls her "Nana Mom." *Id.* at 58-59. Foster Mother meets all of Child's needs and is very involved with Child's services and therapy. *Id.* Child is in a kinship home with her half-sibling A.T., who she loves and looks to as her big brother. *Id.* at 59, 76. Further, Mr. Marquess testified that it would be detrimental for her to be removed from Foster Mother's home, and that it would not cause Child irreparable harm if Father's parental rights were terminated. *Id.* at 60. Additionally, Foster Mother wishes to adopt Child. *Id.* at 75.

Father testified that he recalled being court-ordered to complete his SCP objectives. *Id.* at 87. Father stated that it "was hard" to complete his objectives and communicate with Mr. Marquess. *Id.* at 87-88. He further claimed that "someone" at CUA told him he was not allowed to see his daughter and that "it was already over." *Id.* Father also stated that he did not complete objectives such as his parenting class because no one told him what he needed to do. *Id.* at 95-96.

Father claimed that he worked two jobs, as a home health aide and a delivery person, and had "always" provided paystubs as proof of employment. *Id.* at 88, 92. Father stated that his work hours limited his opportunities to visit Child, and that he also worked overnights. *Id.* at 94. Father testified that he did not call Foster Mother to ask about Child very often. *Id.* at 88-89. Father admitted that he did not ask about nor request to participate in Child's therapy or services but was "willing to do it." *Id.* at 90. Father admitted that he never attempted to go to CUA in person. *Id.* at 91.

Father testified that he wants to see his daughter and has been working towards obtaining an appropriate home for Child. *Id.* at 89-90. When asked why it took two years to decide that he was ready to participate, Father stated that he was working a lot, had to pay child support, and that he had "a lot going on." *Id.* at 90. When asked about basic information such as Child's birthday or favorite color, Father gave the wrong date for her birthday and stated that he did not know her favorite color. *Id.* at 97. Father stated, "I just know she [likes] to play with the Disney doll . . . I forgot which one." *Id.*

At the conclusion of the testimony concerning Child, the trial court recited the procedural history of Child's case. *Id.* at 124-26. The court observed that, throughout the pendency of the case, Father was not in compliance with his reunification objectives. *Id.* at 124-25. Therefore, the court concluded that DHS had proven that a goal change to adoption was in Child's best interests. *Id.* Ultimately, the trial court concluded that termination of Father's parental rights was in Child's best interests under

Section 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). *Id.* at 129. That same day, the trial court entered a decree terminating Father's parental rights to Child and an order changing Child's permanency goal to adoption.

Father simultaneously filed timely notices of appeal and Pa.R.A.P. 1925(a)(2)(i) statements at each trial court docket number. In lieu of a Rule 1925(a) opinion, the trial court issued a notice of compliance with Rule 1925(a) in which it referred to sections from the notes of testimony where the court stated its reasons for terminating Father's parental rights on the record.[6] Trial Ct. Rule 1925(a) Order, 7/8/22, at 1-2.

On appeal, Father raises the following issues for our review:

1. Did the [trial] court err by finding that evidence presented by DHS was clear and convincing?

2. Did the [trial] court err in granting goal change from reunification to adoption?

---

[6] We emphasize that our standards of review require deference to the trial court's findings of fact and credibility determinations and that, generally, this requires the filing of an opinion pursuant to Pa.R.A.P. 1925(a). *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (noting that "there are clear reasons for applying an abuse of discretion standard of review in [dependency and termination of parental rights] cases" and acknowledging that "unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents" (citations omitted)); *see also Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021) (emphasizing that "[w]hen a trial court makes a 'close call' in a fact-intensive case . . . the appellate court should not search the record for contrary conclusions or substitute its judgment for that of the trial court").

3. Did the [trial] court abuse its discretion in finding that goal change and termination of parental rights are best suited to the protection and physical, mental, and moral welfare of the child?

4. Did the [trial] court err in terminating Father's parental rights?

Father's Brief at 7 (formatting altered).[7]

## Termination of Parental Rights

We begin by stating our standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted and formatting altered). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and

_____

[7] Father's brief cites very little case law and instead relies heavily upon law review articles and the United Nations' website, which are not precedential authorities. *See*, *e.g.*, Father's Brief at 21-44. We caution Father that he risks waiver, as this Court has held that "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (citations omitted); *see also* Pa.R.A.P. 2119(a) (providing that the argument section of appellate brief shall contain discussion of issues raised therein and citation to pertinent legal authorities). However, because we may discern his arguments on appeal, we decline to find waiver in this instance.

resolve conflicts in the evidence." *In re Q.R.D.*, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted).

The burden is on the petitioner "to prove by clear and convincing evidence that [the] asserted grounds for seeking the termination of parental rights are valid." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). We have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004).

## Section 2511(a)(1)

Father argues that the trial court erred in terminating his parental rights because he has not refused to perform parental duties. Father's Brief at 23. Rather, Father contends that he wants his child and "was never requested to do any specific tasks." ***See id.***

Section 2511(a)(1) provides, in relevant part, as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child **or** fails to perform parental duties for at least the six months prior to the filing of the termination petition." ***In re Z.P.***, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted, emphasis in original). "Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision." ***In re B., N.M.***, 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted).

This Court has explained:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*Id.* (citations omitted and formatting altered).

Where the petitioners have presented clear and convincing evidence that a parent has demonstrated a settled purpose of relinquishing parental rights or has refused or failed to perform parental duties, "the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child

- 11 -

pursuant to Section 2511(b)." ***Matter of Adoption of Charles E.D.M.*, *II*,**

708 A.2d 88, 91 (Pa. 1998) (citation omitted).

Additionally, our Supreme Court has explained that

[t]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

***Z.P.***, 994 A.2d at 1119 (citations omitted).

Here, the trial court set forth the reasons for terminating Father's

parental rights as follows:

After hearing lengthy testimony in this case, the [c]ourt is going to grant the involuntary termination as to both parents and the unknown father. By way of history, this child was adjudicated [dependent] on July 13, 2020.

At that time, the [c]ourt found sufficient basis to remove the child from the care of both parents at that time. In that order the objectives for both parents were set forth and detailed directly in the order where Father was present. On November 16, 2020, at a permanency review, the [c]ourt again set out objectives for both parents that were stated in that [c]ourt order.

On April 27, 2021, there was another hearing before this [c]ourt. And at that permanency review, again objectives were laid out for the parents by the hearing officer involved.

On September 13, 2021, the case came back for a permanency review order at that time. Both parents were given ratings . . . [a]nd Father was found to have no progress with regards to the circumstances that resulted in the children being brought into care. Also, again at that hearing, objectives were set forth for both parents.

Similarly, at the December 6, 2021 hearing, at that time . . . . Father was found to have no progress . . . and there was no compliance for Father at that time. And again, objectives were set forth in that [c]ourt order. So the [c]ourt is convinced that objectives have been laid out for parents during the life of this case. In this situation the [c]ourt heard clear and convincing evidence and found the testimony by the CUA case worker to be credible.

In contradiction, [the court] did not find the parents' testimony to be credible. With regards to [Section] 2511[(a)(1)], it sets forth that parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

[The court] heard clear and convincing evidence to substantiate this element has been satisfied as to both parents in this case. They have not been in their child's life for almost 25 months at this point. They have not taken any of the necessary steps in order to be considered for reunification with their child.

N.T. Hr'g, 6/2/22, at 121-25 (formatting altered).

Following our review, we conclude that the trial court's findings are supported by competent, clear, and convincing evidence in the record, and we find no error in the court's legal conclusions. *See T.S.M.*, 71 A.3d at 267. The record supports the trial court's determination that although Father was aware of his objectives for reunification throughout the pendency of this case, he failed to complete them. Similarly, the record supports the trial court's finding that Father has not been in Child's life in a parental capacity for almost twenty-five months. Therefore, the trial court did not abuse its discretion by terminating Father's parental rights to Child pursuant to Section 2511(a)(1). *See Z.P.*, 994 A.2d at 1117. Accordingly, Father is not entitled to relief.

## Section 2511(b)

Father also challenges the trial court's conclusion that termination was appropriate under Section 2511(b). Father's Brief at 26-27. Specifically, he contends that "abolishing the child's father would traumatize the child." *Id.* Father admits that Child has a good life with her caregiver and sibling, but claims that "prior to termination there was a degree of relationship with [Father] and the possibility of a growing relationship." *Id.* at 27.

Section 2511(b) states in relevant part:

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent . . . .

23 Pa.C.S. § 2511(b).

"[T]he focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child." *In re C.L.G.*, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*) (citation omitted). This Court has explained:

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of

- 14 -

relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (citations omitted and formatting altered). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *T.S.M.*, 71 A.3d at 268 (citation omitted).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). The question is whether the bond between the parent and the child "is the one worth saving or whether it could be sacrificed without irreparable harm to" the child. *Id.* at 764. "Section 2511(b) does not require a formal bonding evaluation" and caseworkers may offer their opinions and evaluations of the bond. *Z.P.*, 994 A.2d at 1121 (citation omitted).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, . . . the result, all too often, is catastrophically maladjusted children." *T.S.M.*, 71 A.3d at 269. Finally, we reiterate that the court may emphasize the safety needs of the child. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

Here, with regard to Section 2511(b), the trial court stated:

[T]his [C]hild has not seen either parent for more than two years. And there is no evidence of any bond or that this [C]hild would suffer any irreparable harm as a result of having the parental rights terminated . . . . This is not a reflection of the [c]ourt's opinion as to whether the parents have love for their [C]hild in this case.

This is a situation where this [C]hild came into care more than two years ago. And my responsibility is to do what's in the best interest of this [C]hild, and there is a loving home where this [C]hild is currently placed with a sibling. And this [C]hild is fortunate to have that option. And I am freeing this [C]hild for adoption.

N.T. Hr'g, 6/2/22, at 128-29.

Following our review of the record, we discern no abuse of discretion by the trial court. *See **T.S.M.***, 71 A.3d at 267. The record supports the trial court's conclusion that there was no bond between Father and Child, that Foster Mother fulfills a parental role for Child, and that there would be no irreparable harm to Child if Father's parental rights were terminated. *See **K.Z.S.***, 946 A.2d at 764. On the contrary, Child would suffer harm if she were removed from the custody of Foster Mother. Although Father seeks additional time to develop a bond with Child, the ***T.S.M.*** Court directed that in weighing the bond considerations under Section 2511(b) "courts must keep the ticking clock of childhood ever in mind." ***T.S.M.***, 71 A.3d at 269. Accordingly, the trial court did not abuse its discretion in concluding that the termination of Father's parental rights would best serve Child's developmental, physical, and

emotional needs and welfare.  ***See C.L.G.***, 956 A.2d at 1009-10.  Therefore, Father is not entitled to relief on this claim.

### Permanency Goal Change

In his final issue, Father contends that the trial court erred in changing Child's permanency goal from reunification to adoption.  Father's Brief at 27. Father admits that Child was in a family setting with a loving caregiver but argues he could have "enhance[d]" this family setting.  ***Id.*** at 28-29.  Father further argues that he had never been accused of abuse, so once Child was placed in caregiver's home, the reason for placement had been alleviated.  ***Id.*** at 29.  Instead of a goal change to adoption, Father contends that permanent legal custody would have been an appropriate placement so that he could "participate in the family to the extent of his ability in a positive and loving way."  ***Id.***

At the outset, we note that Father's challenge to the goal change is moot based on our decision to affirm the order terminating Father's parental rights under Section 2511(a)(1) and (b).  ***See Interest of A.M.***, 256 A.3d 1263, 1272-73 (Pa. Super. 2021).  In any event, for the reasons stated herein concerning the Child's best interests, we discern no abuse of discretion or error of law in the trial court's determination that a goal change to adoption was in Child's best interests.[8]  ***See*** 42 Pa.C.S. § 6351(f) (setting forth the

---

[8] The trial court noted that Father had made no progress on alleviating the issues which had brought Child into care and stated:
*(Footnote Continued Next Page)*

- 17 -

factors for a goal change determination); *In re R.M.G.*, 997 A.2d 339, 345, 347 (Pa. Super. 2010) (noting that "goal change decisions are subject to an abuse of discretion standard of review" and that a child's safety, permanency, and well-being take precedence over all other considerations in a goal change decision (citation omitted)).

Therefore, even if we were to consider Father's challenge to the order changing Child's goal to adoption, we conclude that the trial court considered all relevant factors, and this Court will not disturb the trial court's determination that Child's need for permanency outweighed Father's hopes to reunify with Child in the future. *See R.M.G.*, 997 A.2d at 347.

For these reasons, we affirm the trial court's order changing Child's permanency goal to adoption and the decree terminating Father's parental rights.

Order and decree affirmed.

---

> This is a situation where this child came into care more than two years ago. And my responsibility to do what's in the best interest of this child, and there is a loving home where this child is currently placed with a sibling. And this child is fortunate to have that option. And I am freeing this child for adoption.

N.T. Hr'g, 6/2/22, at 128-29.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/8/2022